UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
EVE SALES CORP. and MARIE SHARP'S
FINE FOODS, LTD.,

         Plaintiffs,      24-cv-2757 (PKC)

    -against-         OPINION AND ORDER

MARIE SHARP'S, USA, LLC,

         Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.,

    Marie Sharp, who is not a party to this action, was inducted into the Hot Sauce Hall of Fame in Brooklyn, New York in 2016. The company she founded, plaintiff Marie Sharp's Fine Foods, Ltd. ("MSFF"), is headquartered in Belize and sells branded sauces, jams and jellies. At some point, defendant Marie Sharp's USA, LLC ("MSUSA"), headquartered in North Carolina, began distributing MSFF products in the United States. Plaintiff Eve Sales Corp. ("ESC") is a New York-based purchaser of MSFF-branded products. This action and a companion action pending in the United States District Court for the Middle District of North Carolina arise out of the breakdown in MSUSA's relationships with MSFF and ESC.

    The parties were unable to resolve their differences outside of court. Ultimately, MSUSA asked MSFF if it would agree to waive service of process in the action that MSUSA threatened to bring against MSFF and ESC. Instead of responding to the waiver request, MSFF and ESC initiated this action against MSUSA by filing a complaint seeking exclusively declaratory relief.

About two months later, MSUSA filed its own complaint against MSFF and ESC in the Middle District of North Carolina, asserting claims for breach of contract, tortious interference, and fraudulent and/or negligent misrepresentation arising out of principally the same underlying events that form the basis for this action.

MSFF and ESC have twice amended their complaint in this action. The operative pleading, the Second Amended Complaint ("SAC") (ECF 24), was filed after the institution of the action in the Middle District of North Carolina and has added a breach of contract claim to the initial complaint's declaratory judgment claims. MSUSA now moves to dismiss the SAC or, in the alternative, to transfer this action to the Middle District of North Carolina pursuant to 28 U.S.C. § 1404(a). For reasons that will be explained, including the conclusion that this action was initiated as an improper anticipatory declaratory judgment action as defined by the Second Circuit, MSUSA's motion to transfer will be granted.

BACKGROUND

The claims in the SAC center on two agreements for the distribution and sale of products manufactured by MSFF. (ECF 24 ¶¶ 1, 13.) On October 26, 2017, MSUSA, then known as Thoughtleader.com, LLC, and ESC, a food products distributor, entered into an agreement (the "2017 Agreement") whereby ESC agreed to purchase MSFF products "only" from MSUSA and MSUSA authorized ESC to sell those products to certain clients and markets. (Id. ¶¶ 6, 12; ECF 24-1 ¶¶ 1-2.) MSUSA and MSFF also entered into an agreement dated April 1, 2022 (the "2022 Agreement") in which MSFF agreed to supply its products to MSUSA "for the purpose of sales, marketing, promotion and distribution" within the United States. (ECF 24-2 at 2.) The 2022 Agreement appointed MSUSA as the "official USA Representative." (Id.) MSFF, ESC, and MSUSA are headquartered in Belize, New York, and North Carolina, respectively. (ECF 24 ¶¶ 4-6.)

MSUSA's relationship with ESC eventually broke down. Plaintiffs assert that in 2018, ESC discovered that MSUSA's President had made misrepresentations to it regarding MSUSA's rights to distribute and control the pricing of MSFF products. (Id. ¶¶ 14, 37-38.) ESC "immediately contacted" MSUSA's President to "express its dismay as to his misrepresentations." (Id. ¶ 39.) ESC also allegedly terminated the 2017 Agreement at this time. (Id.) Nonetheless, by late 2018 or early 2019, MSUSA and ESC had agreed to pursue a new joint proposal for them to work with MSFF in the United States. (Id. ¶ 41.) MSFF and ESC claim that all parties agreed to the joint proposal. (Id. ¶ 45.) But MSUSA's relationship with ESC reached another breaking point. ESC and MSFF repeatedly took issue with the manner in which MSUSA was conducting its business. (See, e.g., id. ¶¶ 47, 49.) In or about April 2023, ESC notified MSUSA that it was no longer willing to work with it. (Id. ¶ 67.) After ceasing to do business with MSUSA, ESC began purchasing MSFF products directly from MSFF. (Id.)

On March 6, 2024, MSUSA sent MSFF a letter stating that it considered the direct sales between MSFF and ESC to be in violation of its 2022 Agreement with MSFF and its 2017 Agreement with ESC. (ECF 21-1 at 6.) It was MSUSA's view that the 2022 Agreement granted it the exclusive right to distribute MSFF products in the U.S. (Id.) Noting that MSUSA's "damages due to this violation . . . are quite substantial and continue to accrue," the letter "urge[d] MSFF to cease all direct sales to US customers." (Id. at 6-7.) In response, on March 15, MSFF provided MSUSA with written notice of no-cause termination of the 2022 Agreement. (ECF 24 ¶ 69; ECF 26-3 at 1.) The effective date of the 2022 Agreement's termination was June 13. (ECF 24 ¶ 79; ECF 26-3 at 1.) MSFF also provided MSUSA with a new, non-exclusive distribution agreement for its consideration. (ECF 24 ¶ 69.)

Following MSFF's notice of termination, MSUSA sought to secure full exclusivity from MSFF, and began to threaten litigation. In a March 21 email to MSFF's counsel, MSUSA's counsel asserted that MSFF had breached the 2022 Agreement and tortiously interfered with MSUSA's separate agreement with ESC. (ECF 26-13 at 4-5.) MSUSA's counsel stated that "[his] client would prefer to avoid litigation," but "[i]f MSFF is not amenable to negotiation of an acceptable and exclusive agreement and an immediate cessation of direct sales, MSUSA will be forced to pursue remedies at law." (Id. at 5)

MSUSA then turned its focus to ESC. On April 2, MSUSA's counsel sent a cease and desist letter to ESC. (ECF 26-9 at 1.) The letter stated that ESC's direct purchases from MSFF were in breach of the 2017 Agreement's exclusivity requirement and that ESC had also tortiously interfered with MSUSA's separate agreement with MSFF. (Id.) The letter continued, "Your breach and tortious interference have caused substantial financial damage to MSUSA." (Id.) It then requested that ESC "immediately cease and desist from any and all direct purchases from MSFF." (Id.)

Still without a response from MSFF regarding its exclusivity demand, MSUSA's counsel sent another email to MSFF's counsel on April 4. (ECF 26-10 at 1.) He informed MSFF's counsel, "My client has asked me to move forward with preparation for litigation." (Id.) He also asked, "Will you waive service on behalf of your client?" (Id.) Later that day, MSFF's counsel emailed MSUSA's counsel to address the latter's March 21 email. (ECF 26-13 at 2-4.) While MSFF disagreed that the 2022 Agreement made MSUSA the exclusive distributor of its products in the U.S., it nonetheless offered to designate MSUSA as its exclusive distributor to Walmart. (Id. at 3.) MSUSA would otherwise remain a non-exclusive distributor pursuant to the new distribution agreement that MSFF had previously shared with MSUSA. (Id.)

- 4 -

Case 1:25-cv-00173-CCE-JLW    Document 41    Filed 02/24/25    Page 4 of 20

MSUSA rejected MSFF's offer the next day. (Id. at 1.) Replying to MSFF's counsel, MSUSA's counsel reiterated that MSFF had breached the 2022 Agreement and tortiously interfered with MSUSA's contractual relationship with ESC. (Id. at 2.) He stated that MSFF's termination of the 2022 Agreement "doesn't resolve the breach or tortious interference" and "only solidified and magnified the damages." (Id.) He added that the company "remains willing to discuss an exclusive distribution agreement." (Id.)

MSUSA did not receive a response from MSFF to its April 5 email. On April 9, MSUSA's counsel again raised the question of waiver of service with MSFF's counsel. He wrote, "Would you mind answering whether you firm will either accept service on behalf of MSFF or waive service? Alternatively, we can follow the Hague Service Convention, though we will seek reimbursement for our costs." (Id. at 1.)

Two days later, MSFF and ESC filed their initial complaint in this action seeking declaratory relief pursuant to the Declaratory Judgment Act. (ECF 1.) In particular, MSFF and ESC brought five claims seeking declarations that 1) the 2017 Agreement was terminated, 2) the 2022 Agreement was terminated, 3) ESC has a right to do business directly with MSFF and MSFF has a right to do business directly with ESC and any other distributors, 4) ESC did not tortiously interfere with any of MSUSA's rights under the 2022 Agreement, and 5) MSFF did not tortiously interfere with any of MSUSA's rights under the 2017 Agreement. (Id. at 14-20.) ESC also notified MSUSA, through counsel, that "to the extent there is any questions whether ESC previously terminated the 2017 agreement . . . the 2017 agreement is terminated." (ECF 24 ¶ 77.) MSUSA waived service of a summons. (ECF 14.) Following this, MSFF and ESC filed a First Amended Complaint to allege the citizenship of MSUSA's members. (ECF 16 ¶ 7.) On July 24, MSFF and ESC filed the operative SAC, which adds a claim for breach of contract and

maintains the initial complaint's five declaratory judgment claims. (ECF 24 at 16-23.) The breach of contract claim alleges that MSUSA breached the 2022 Agreement with MSFF by failing to 1) pay the outstanding amount due on an order it placed from MSFF after receiving notice of termination, 2) timely cease holding itself out as an authorized distributor of MSFF products or using, or authorizing others to use, MSFF's intellectual property, and 3) comport with the 2022 Agreement's requirement that MSUSA conduct its business in a manner that reflects favorably on MSFF. (Id. ¶¶ 85-89.)

MSUSA has responded to this action in two ways. First, on June 14, 2024, it filed a complaint in the Middle District of North Carolina (the "North Carolina Action") asserting claims for breach of contract, tortious interference, and fraudulent and/or negligent misrepresentation against MSFF and ESC.[1] Complaint at 8-11, Marie Sharp's USA, LLC v. Eve Sales Corporation, et al., 24-cv-491 (CCE) (JLW) (M.D.N.C. June 14, 2024), ECF 1. The complaint's allegations center on the direct sale and purchase of MSFF products between MSFF and ESC and resulting violations of the 2017 and 2022 Agreements. See id. ¶¶ 40-41, 44-45, 49, 54, 58-61. Second, MSUSA now moves to dismiss the SAC or, in the alternative, to transfer this action to the Middle District of North Carolina pursuant to 28 U.S.C. § 1404(a). In its motion, MSUSA also seeks to recover its fees due to the "blatantly abusive nature of Plaintiffs' filings." The Court treats this as a motion for sanctions under Rule 11, Fed. R. Civ. P.

MSUSA's motion to dismiss or transfer has been fully briefed, including supplemental memorandums of law submitted by the parties at the Court's request regarding the motion to transfer. (ECF 36-37.)

DISCUSSION

---

[1] Notably, the North Carolina Action was commenced before the filing of the SAC adding for the first time a breach of contract claim by MSFF against MSUSA.

Motion to Transfer and First-Filed Rule

Because there are "strong considerations favoring transfer" in this case, the Court resolves MSUSA's motion to transfer before its motion to dismiss. Allied World Surplus Lines Insurance Co. v. Elamex USA, Corp., 23-cv-9992 (LJL), 2024 WL 2212948, at *3 (S.D.N.Y. May 16, 2024) (citation omitted).

The standard for evaluating a motion to transfer pursuant to 28 U.S.C. § 1404(a) is well-established. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Id. This sets out a "two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice, a transfer is appropriate." Lihuan Wang v. Phoenix Satellite Television US, Inc., 13-cv-218 (PKC), 2014 WL 116220, at *2 (S.D.N.Y. Jan. 13, 2014) (quoting AGCS Marine Insurance Co. v. Associated Gas & Oil Co., Ltd., 775 F. Supp. 2d 640, 645 (S.D.N.Y. 2011)) (internal quotation marks omitted). The burden is on the party moving to transfer to show by clear and convincing evidence that transfer is warranted. See New York Marine and General Insurance Co. v. Lafarge North America, Inc., 599 F.3d 102, 113-14 (2d Cir. 2010). Nonetheless, "[d]istrict courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006).

When, as here, there are two competing lawsuits, a court must also determine whether the first-filed rule applies. The first-filed rule generally dictates that "the first suit should have priority" in order to avoid "duplicative litigation" and honor "the plaintiff's choice of forum." Employers Insurance of Wausau v. Fox Entertainment Group, Inc., 522 F.3d 271, 275 (2d Cir.

2008) (quoting First City National Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989)). But the rule "does not constitute an invariable mandate." Id. It is "only a presumption that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action." Id. (quoting Berisford Capital Corp. v. Central States, Southeast and Southwest Areas Pension Fund, 677 F. Supp. 220, 222 (S.D.N.Y. 1988)) (internal quotation marks omitted). The Second Circuit has "recognized only two exceptions to the first-filed rule: (1) where the 'balance of convenience' favors the second-filed action, and (2) where 'special circumstances' warrant giving priority to the second suit." Id. (citations omitted). A special circumstance is present "where the first-filed lawsuit is an improper anticipatory declaratory judgment action." Id. Both exceptions to the first-filed rule "are premised on the notion that the federal declaratory judgment is not a prize to the winner of a race to the courthouses." Id. (quoting Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 219 (2d Cir. 1978), abrogated on other grounds by Pirone v. MacMillan, Inc., 894 F.2d 579, 586 (2d Cir. 1990)).

Anticipatory Declaratory Judgment Action

Departure from the first-filed rule is warranted here because MSFF's and ESC's initial filing was an "improper anticipatory declaratory judgment action." Such an action is one "filed in response to a specific, direct threat of litigation," id. at 276, which seeks to "deprive the 'natural plaintiff' of its choice of forum." Id. at 276 n.4 (citation omitted). The Second Circuit has stated that "in order for a declaratory judgment action to be anticipatory, it must be filed in response to a direct threat of litigation that gives specific warnings as to deadlines and subsequent legal action." Id. The Second Circuit has also held that "the filing of a declaratory judgment action triggered by a notice letter is a persuasive indicator of anticipatory conduct." Chicago Insurance Co. v. Holzer, 00-cv-1062 (SAS), 2000 WL 777907, at *2 (S.D.N.Y. June 16, 2000) (citing

Factors, 579 F.2d at 219). "When a notice letter informs a defendant of the intention to file suit, a filing date, and/or a specific forum for the filing of the suit, the courts have found, in the exercise of discretion, in favor of the second-filed action." J. Lyons & Co. Ltd. v. Republic of Tea, Inc., 892 F. Supp. 486, 491 (S.D.N.Y. 1995); see also Kule, LLC v. Alfwear, Inc., 23-cv-756 (LTS), 2023 WL 8894000, at *4 (S.D.N.Y. Dec. 26, 2023). So long as it contains one of these three components, the notice can be sufficient to render an ensuing declaratory judgment action improperly anticipatory. See Chicago Insurance Co., 2000 WL 777907, at *3 ("While it may be preferable for the notice to cover all three bases, any of the factors is sufficient to provide adequate notice.").

In Factors, for instance, the notice letter that preceded the first-filed declaratory judgment action communicated an intention to file suit by warning the defendant that "it would be subject to a lawsuit for injunctive relief, damages and an accounting" if it did not discontinue its sale of an allegedly infringing product. 579 F.2d at 217. In affirming the district court's decision to allow the later filed action to proceed, the Second Circuit recognized that the declaratory judgment action was "triggered by a notice letter" and "filed in apparent anticipation" of the later suit. Id. at 219. A similar notice letter was sent by the defendant's attorney in CGI Solutions LLC v. Sailtime Licensing Group, LLC, 05-cv-4120 (DAB), 2005 WL 3097533, at *3 (S.D.N.Y. Nov. 17, 2005), which warned that if the plaintiffs did not cease and desist their alleged misconduct the defendant would "pursue all civil remedies available to it if necessary" and "may file a lawsuit seeking injunctive relief and civil damages for breach of contract, conversion, theft of trade secrets, copyright infringement, unfair competition or other causes of action." In determining that the declaratory judgment action that followed was improperly anticipatory, the court noted that the defendant's letter "delineated very specific claims" and held that it "sufficiently notified Plaintiffs

- 9 -

Case 1:25-cv-00173-CCE-JLW    Document 41    Filed 02/24/25    Page 9 of 20

of [the defendant's] resolve to sue." Id. at *2-4. The court in Havas Worldwide New York, Inc. v. Lionsgate Entertainment Inc., 15-cv-5018 (KBF), 2015 WL 5710984, at *3 (S.D.N.Y. Sept. 29, 2015) also found that a declaratory judgment action was improperly anticipatory where it followed a notice letter that communicated the defendant's "intention to file suit and the forum in which it would do so." That letter provided "more concrete notice" than prior communications, stating that if the parties could not reach a settlement the defendant was "prepared to resolve these issues through litigation" and would file suit in "the Central District of California." Id. at *1, *3.

Likewise, MSUSA conveyed its intention to file suit through the correspondence that its attorney sent to MSFF and ESC prior to their filing of the initial complaint in this action seeking only declaratory relief. In a March 21 email to MSFF's counsel, MSUSA's counsel made clear that if MSFF was unwilling to negotiate a fully exclusive distribution agreement and the cessation of direct sales to ESC then MSUSA "will be forced to pursue remedies at law." (ECF 26-13 at 5.) In that same email, MSUSA's counsel referenced specific causes of action for breach of contract and tortious interference, as well as MSUSA's entitlement to damages. (Id.) He continued to reference those claims and that relief in the cease and desist letter that he sent to ESC on April 2 and in his April 5 email to MSFF's counsel. (Id. at 1-2; ECF 26-9 at 1.) MSUSA also laid bare its strengthening resolve to file suit as its negotiations with MSFF failed to meaningfully progress. Not having received a response to the March 21 proposal, MSUSA's counsel informed MSFF's counsel on April 4 that MSUSA had asked him "to move forward with preparation for litigation." (ECF 26-10 at 1.) Signaling that MSUSA was readying to file a complaint, MSUSA's counsel asked, "Will you waive service on behalf of your client?" (Id.) The next day, MSUSA rejected MSFF's offer of exclusivity solely as to Walmart, and reiterated that it would only accept full exclusivity. (ECF 26-13 at 1-2.) As of April 9, MSUSA had not received any further response

from MSFF. At that point, MSUSA's counsel asked once more whether MSFF's counsel would accept or waive service on behalf of MSFF, and added that it could follow the Hague Service Convention but would "seek reimbursement for our costs." (Id. at 1.) Two days later, on April 11, MSFF and ESC filed this action initially seeking only declaratory relief.

In the run up to the filing of this action by MSFF and ESC, MSUSA indicated that it would bring a lawsuit if MSFF did not engage in negotiations on MSUSA's terms and specified the claims it would assert against MSFF and ESC and the relief it would seek. In addition, MSUSA communicated its decision to begin preparing for litigation when negotiations seemingly stalled, and signaled that it was taking concrete steps toward filing a complaint by asking whether MSFF's counsel would waive or accept service on behalf of MSFF. Taken together, MSUSA placed MSFF and ESC on notice of its intention to file suit. MSFF's and ESC's declaratory judgment action—filed just two days after the last inquiry from MSUSA's counsel about service of process—was therefore an "improper anticipatory declaratory judgment action" as that term is used in Employers Insurance of Wausau, 522 F.3d at 275-76.

The Court's determination is not altered by MSUSA's attempts to negotiate a resolution or reach a settlement outside of court. (ECF 26-13 at 2, 5-6.) Indeed, "[w]here a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit." Ontel Products, Inc. v. Project Strategies Corp., 899 F. Supp. 1144, 1150 (S.D.N.Y. 1995). To hold otherwise would dissuade potential plaintiffs "from first attempting to resolve their claims without resorting to litigation." Id. The Court will not "penalize" MSUSA, as the "'natural plaintiff' . . . who claims their *existing* rights are being violated," for waiting to file suit while it attempted to reach a negotiated resolution.

- 11 -

Kule, 2023 WL 8894000, at *5. Because MSFF's and ESC's "improper anticipatory declaratory judgment action" presents a special circumstance, the Court concludes that the presumption afforded by the first-filed rule does not apply here.

Balance of Convenience

The balance of convenience exception provides an additional basis to depart from the first-filed rule in this case. At the same time, the balance of convenience favors transferring this action to the Middle District of North Carolina.[2] As the Second Circuit has recognized, the "factors relevant to the balance of convenience analysis are essentially the same as those considered in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a)." Employers Insurance of Wausau, 522 F.3d at 275 (quoting Everest Capital Ltd. v. Everest Funds Management., L.L.C., 178 F. Supp. 2d 459, 465 (S.D.N.Y. 2002)). "Because the factors to be considered by the Court are substantially identical, a single analysis of the factors will resolve both issues." AIG Financial Products Corp. v. Public Utility District No. 1 of Snohomish County, Washington, 675 F. Supp. 2d 354, 368 (S.D.N.Y. 2009).

"Among the many factors to be considered in determining whether to grant a motion to transfer venue 'are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.'" New York Marine, 599 F.3d at 112 (quoting D.H. Blair, 462 F.3d at 106-07). Courts also consider "the forum's familiarity with the governing law" and "trial efficiency and the interests of justice."

---

[2] The parties do not dispute that this action could have been brought in the Middle District of North Carolina.

Wang, 2014 WL 116220, at *2 (quoting Everlast World's Boxing Headquarters Corp. v. Ringside, Inc., 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013)).

Trial efficiency and the interests of justice weigh very strongly in favor of transferring this action to the Middle District of North Carolina. Under the present circumstances, transfer serves the important interest of avoiding "abuse of the declaratory judgment remedy." Unique Industries, Inc. v. Lisa Frank, Inc., 93-cv-8037 (LAP), 1994 WL 525041, at *2 (S.D.N.Y. Sept. 23, 1994). MSFF's and ESC's declaratory judgment action was anticipatory when it was initially filed. In the operative SAC, their declaratory judgment claims also fall outside the scope of the Declaratory Judgment Act's purpose. That "fundamental purpose" is to "avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." U.S. v. Doherty, 786 F.2d 491, 498 (2d Cir. 1986) (quoting Luckenbach Steamship Co. v. U.S., 312 F.2d 545, 548 (2d Cir. 1963)) (internal quotation marks omitted); see also In re Combustion Equipment Associates, Inc., 838 F.2d 35, 37 (2d Cir. 1988) ("The purpose of the [Declaratory Judgment] Act is to enable parties to adjudicate disputes before either side suffers great damage."). Stated another way, "the declaratory judgment procedure 'creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it.'" Doherty, 786 F.2d at 498 (quoting Wright, The Law of Federal Courts § 100, at 671 (4th ed. 1983)).

Damages that may be due from MSFF and ESC for the contractual breaches and tortious interference that MSUSA alleges have already accrued. MSFF and ESC brought suit after they had begun selling and buying MSFF products, respectively, directly to and from one another.

- 13 -

Case 1:25-cv-00173-CCE-JLW    Document 41    Filed 02/24/25    Page 13 of 20

(ECF 24 ¶ 67.) In fact, "[p]rior to the filing of this action, MSFF made 13 shipments of MSFF Products directly to [ESC] for a purchase price of $953,372." (ECF 21-1 at 3 ¶ 6.) Had ESC placed these orders through MSUSA, MSUSA would have earned approximately "$190,674 at its usual 20% markup." (ECF 21-2 at 3-4 ¶ 8.) In Counts II, III, V, and VI of the SAC, MSFF and ESC now seek declarations that they terminated the 2022 and 2017 Agreements and did not tortiously interfere with MSUSA's rights under those agreements. (ECF 24 at 17-19, 21-23.) While these declaratory judgment claims may establish defenses to their potential liability, at this stage they will not enable MSFF and ESC to avoid the accrual of damages for their previous conduct. To the extent that Count IV of the SAC would avoid the accrual of some future damages through a declaration that MSFF and ESC have the right to do business directly with one another and that MSFF in particular also has the right to do business directly with other distributors going forward, this does not change the fact that damages in this case have already accrued. (Id. at 20-21.) To go along with this, any damages that may be due appear to arise in substantial part from MSFF's and ESC's pre-filing, rather than post-filing, conduct. (See ECF 21-1 at 3 ¶ 6 ("Since the filing of this action, [ESC] has placed two additional orders [for MSFF products] for a purchase price of approximately $150,000.").) And by the time MSFF and ESC filed all of their declaratory judgment claims, this dispute had already reached the stage at which, due to MSFF's and ESC's alleged misconduct, MSUSA was entitled to seek damages for breach of contract and tortious interference. MSUSA cannot be deemed to have failed to sue for this remedy simply because MSFF and ESC successfully raced to court first.

The existence of the North Carolina Action is also significant to the Court's consideration of trial efficiency and the interests of justice. "It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer." APA Excelsior

III L.P. v. Premiere Technologies, Inc., 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999). That is because "[t]he benefits of consolidating related cases in a common forum are often substantial." Allied World Surplus, 2024 WL 2212948, at *9 (quoting American S.S. Owners Mutual Protection and Indemnity Association, Inc. v. American Boat Co., LLC, 11-cv-6804 (PAE), 2012 WL 1382278, at *3 (S.D.N.Y. Apr. 20, 2012)). In particular, "[s]uch consolidation may advance the strong policy interests of achieving efficient pretrial discovery, avoiding duplicative litigation, and avoiding inconsistent results." Id. (citation omitted). There is no question that the present action and the North Carolina Action are related. They involve the same parties, the same contracts, and many of the same underlying events. As a result, transfer of this action to the Middle District of North Carolina, where it can be consolidated with the North Carolina Action, would facilitate the coordination of pretrial discovery, especially with Belize-based MSFF. Consolidating these cases would also avoid duplicative litigation and inconsistent results as to the parties' rights and obligations under the 2022 and 2017 Agreements. Shorn of the presumption of the first-filed rule, consolidation in MSUSA's chosen forum is proper.

The remaining balance of convenience factors do not outweigh these concerns of trial efficiency and the interests of justice. While a plaintiff's choice of forum is "presumptively entitled to substantial deference," that is not the case here. Gross v. British Broadcasting Corp., 386 F.3d 224, 230 (2d Cir. 2004) (forum non conveniens analysis). At the time of MSFF's and ESC's selection of the Southern District of New York as their forum, their complaint only sought declaratory relief. But that filing was improperly anticipatory, warranting departure from the first-filed rule. Because the first-filed rule is concerned with "honoring the plaintiff's choice of forum," to give any meaningful weight to MSFF's and ESC's selection would unduly confer upon them a benefit that they are not entitled to. Employers Insurance of Wausau, 522 F.3d at 275. The later

addition of the breach of contract claim to the SAC does not call for greater deference to the selection of this forum. That claim alleges breaches of the 2022 Agreement, which, of the two plaintiffs, only MSFF is a party to. (ECF 24 at 16-17.) Given that MSFF is headquartered in Belize and is in turn a foreign plaintiff, its choice of this forum for its breach of contract claim is entitled to less deference. See Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 71 (2d Cir. 2003) ("[W]hen a foreign plaintiff sues in a United States forum such choice is entitled to less deference because one may not easily presume that choice is convenient.") (forum non conveniens analysis). The degree of deference afforded to MSFF's choice is further lessened because it appears to have been solely driven by a desire to litigate its breach of contract claim in ESC's home forum of New York together with their declaratory judgment claims. See Iragorri v. United Technologies Corp., 274 F.3d 65, 72 (2d Cir. 2001) ("[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands.") (forum non conveniens analysis). Accordingly, MSFF's and ESC's choice of forum is entitled to very little deference.

Furthermore, the locus of operative facts is not centered in New York. Determining the locus of operative facts for the breach of contract claim requires considering "the location where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." Power Play 1 LLC v. Norfolk Tide Baseball Club, LLC, 17-cv-4831 (WHP), 2018 WL 357304, at *6 (S.D.N.Y. Jan. 9, 2018) (quoting IKB International S.A. v. Wilmington Trust Co., 16-cv-4917 (RA), 2017 WL 4084052, at *3 (S.D.N.Y. Sept. 14, 2017)). The 2022 Agreement appears to have been negotiated and executed either electronically or in Belize. (See ECF 40 ¶ 4 ("All of MSFF's former business with MSUSA was typically conducted electronically or in-person in Belize.").) Pursuant to the 2022 Agreement, MSFF agreed to supply

MSUSA with its products and MSUSA agreed to sell, market, promote, and distribute those products within the U.S. (ECF 24-2 at 2.) MSFF's performance was therefore to take place between Belize and North Carolina, where MSUSA is based, while MSUSA's performance was to take place between North Carolina and the rest of the U.S. The alleged breaches of the 2022 Agreement concern MSUSA's failure to pay for an order that it placed with MSFF after MSFF gave notice that it was terminating the 2022 Agreement; MSUSA's failure to cease holding itself out as an authorized distributor of MSFF products and stop using, or authorizing others to use, MSFF's intellectual property; and certain conduct by MSUSA that did not reflect favorably on MSFF, including its President's interactions with potential business partners in the U.S. and his social media activity. (ECF 24 ¶¶ 87-89.) These alleged breaches do not appear to have taken place in New York. Instead, since MSUSA conducts its business out of North Carolina, where its President also resides, it is reasonable to conclude that at least some of this conduct took place in that state. Based on the above, the locus of operative facts for the breach of contract claim is closer to North Carolina than it is to New York.

With respect to MSFF's and ESC's declaratory judgment claims, the locus of operative facts only slightly favors New York. These claims primarily concern the meaning of disputed terms in the 2022 and 2017 Agreements having to do with contract termination, the effect of termination, and exclusivity in the distribution and sale of MSFF products. (Id. at 17-23.) To the extent that extraneous facts would have any bearing on the interpretation of these terms, the only relevant connection to New York is that it was the site of the 2017 Agreement's negotiations between ESC and MSUSA's President. (ECF 39 ¶ 17.) As previously noted, the 2022 Agreement appears to have been negotiated electronically or in Belize. Moreover, while all of the orders that ESC placed directly with MSFF were shipped to ESC's warehouse in New York, MSFF's and

- 17 -

Case 1:25-cv-00173-CCE-JLW   Document 41   Filed 02/24/25   Page 17 of 20

ESC's entitlement to declaratory relief does not turn on whether they engaged in the underlying conduct in this dispute. (Id. ¶ 19.) The declaratory judgment claims also partly concern whether ESC verbally terminated the 2017 Agreement in 2018 and the validity of MSFF's written notice of termination of the 2022 Agreement. (ECF 24 ¶¶ 95, 97, 103, 104, 121.) However, it is not clear that ESC verbally terminated the 2017 Agreement from New York. The SAC alleges that during a trip to Chicago ESC learned of certain misrepresentations by MSUSA's President and "immediately contacted" him to convey its concerns, at which point ESC also terminated the 2017 Agreement. (Id. ¶¶ 37-39.) Nor is there any indication that MSFF's written notice of termination originated in New York. Because the locus of operative facts is not centered in New York, this factor does not weigh against transfer.

The convenience of witnesses and the parties only mildly favors New York. In their initial disclosures in the North Carolina Action made pursuant to Rule 26(a)(1), Fed. R. Civ. P., the parties identified four potential witnesses under the control of MSFF who are located in Belize, three under the control of ESC who are located in New York, two under the control of MSUSA who are located in North Carolina, and three potential non-party witnesses located in Alabama, Arkansas, and Ohio. (See ECF 36 at 4-5; ECF 37 at 13-14; ECF 38-1 at 4-6; ECF 38-2 at 4-6; ECF 38-3 at 2-4.) MSFF, ESC, and MSUSA are headquartered in Belize, New York, and North Carolina, respectively. By and large, New York is as inconvenient to MSUSA and its witnesses as North Carolina is to ESC and its witnesses. On the other hand, MSFF and ESC have submitted evidence showing that while there are direct flights available from Belize and the cities where the non-party witnesses are located to New York, there are no direct flights from these same locations to Greensboro, which is in the Middle District of North Carolina. (ECF 39-1 at 2-5.) This may result in longer travel times to Greensboro than to New York for MSFF and its witnesses,

- 18 -

Case 1:25-cv-00173-CCE-JLW    Document 41    Filed 02/24/25    Page 18 of 20

as well as the non-party witnesses. At the same time, however, the differences in travel time between these direct and non-direct flights would not be very substantial, ranging from an additional 45 minutes to get from Alabama to Greensboro to an additional 4 hours and 11 minutes to get from Belize to Greensboro. (ECF 39-1 at 2, 5.) New York is only marginally more convenient for MSFF, its witnesses, and the non-party witnesses.

Lastly, the availability of process to compel the attendance of unwilling witnesses, the location of relevant documents and relative ease of access to sources of proof, the relative means of the parties, and the forum's familiarity with the governing law are each neutral factors. Under Rule 45(c)(1)(A), Fed. R. Civ. P., the potential non-party witnesses are all outside the subpoena power of both the Southern District of New York and the Middle District of North Carolina. (ECF 39 ¶ 25.) As to the location of relevant documents, this "is a neutral factor in today's world of electronic communication and overnight shipping." Pippins v. KPMG LLP, 11-cv-0377 (CM), 2011 WL 1143010, at *5 (S.D.N.Y. Mar. 21, 2011). No party has shown that the physical examination or transportation of documents would be necessary. Given that the parties are business entities, it also appears that they all have adequate resources to litigate this case in either forum. See It's a 10, Inc. v. PH Beauty Labs, Inc., 718 F. Supp. 2d 332, 338 (S.D.N.Y. 2010) ("[T]he relative means of parties . . . is not entitled to great weight where plaintiff and defendant are both corporations.") (quoting Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328, 331 (S.D.N.Y. 1998)). Although MSUSA contends that it is facing insolvency, it has submitted no competent evidence to support its claim. Regarding familiarity with the governing law, the parties do not dispute that either federal court would be equally capable of applying the law found to be applicable to this case.

Case 1:25-cv-00173-CCE-JLW    Document 41    Filed 02/24/25    Page 19 of 20

Having evaluated the balance of convenience factors, the Court concludes that they weigh in favor of transfer to the Middle District of North Carolina and provide an additional basis to depart from the first-filed rule. In particular, the Court has determined that trial efficiency and the interests of justice weigh very strongly in favor of transfer and outweigh the remaining factors.

CONCLUSION

For the reasons explained above, MSUSA's motion to dismiss or transfer this action is GRANTED to the extent that the Clerk is directed to transfer the action to the United States District Court for the Middle District of North Carolina and so much of the motion as seeks outright dismissal of a claim is RESERVED to the transferee Court. MSUSA's request for attorneys' fees and costs due to the "blatantly abusive nature of Plaintiffs' filings," which the Court treats as a motion for sanctions under Rule 11, Fed. R. Civ. P., is DENIED as procedurally improper.[3]

SO ORDERED.

*P. Kevin Castel*
P. Kevin Castel
United States District Judge

Dated: New York, New York
February 24, 2025

---

[3] See Rule 11(c)(2), Fed. R. Civ. P. ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).").